IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **TERRY LYNN JACKSON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:15-cv-696-O** |
| | § | |
| **UNITED STATES** | § | |
| **OF AMERICA, Et Al.,** | § | |
| | § | |
| **Defendants.** | § | |

## OPINION AND ORDER

Before the Court are the individual defendants' motions to dismiss under Federal Rule of

Civil Procedure 12(b)(6) inmate plaintiff Terry Lynn Jackson's complaint that he was denied medical

care in violation of the Eighth Amendment. Also before the Court is the United States's ("USA")

motion for summary judgment on Jackson's claim under the Federal Tort Claims Act (FTCA). This

Opinion and Order addresses and resolves all pending motions and claims.

## I.      PROCEDURAL HISTORY AND BACKGROUND

Jackson initiated this suit with a typed 22–page complaint. Complaint, ECF No. 1.[1] The

Court directed Jackson to answer questions in the form of a more definite statement. Order, ECF No.

12. Jackson then filed a more definite statement ("MDS"). MDS, ECF No. 15.  The MDS was

accompanied with over 80 pages of medical records.[2]

---

[1] Because Jackson had three prior dismissals under 28 U.S.C. § 1915(g), the Court barred him from proceeding *in forma pauperis*. Order 1-5, ECF No. 10; Exhibits 1-5, ECF Nos. 10-1, 10-2. Jackson then paid the applicable fees. ECF No. 12.

[2] The records were identified as: Bureau of Prisons ("BOP") records–Exhibit A 2–68, ECF No. 16; American Diagnostic Services and UNT Health Service records–Exhibit B 69–73, ECF No.16; John Peter Smith ("JPS") records–Exhibit C 74-82, ECF No. 16; BOP Sick Call records–Exhibit D 83-85, ECF No. 16.

The Court, on August 14, 2017, dismissed some of Jackson's claims and defendants under 28 U.S.C. § 1915A(b). *See* Order and J. (Rule 54(b)), ECF Nos. 23, 24. The Court then allowed Jackson to obtain service of his Eighth Amendment claims upon five individual defendants and his FTCA medical negligence claim upon the USA. Order, ECF No. 25.

Jackson alleges that between January 2013 and October 2014, while he was housed at FCI-Seagoville and then FCI-Fort Worth, he was given the wrong medication for his high blood pressure condition. He alleges that he was instead continually given a medication to which he had an allergic reaction, that the medication failed to properly reduce his blood pressure, and that it caused him to sustain a stroke in February 2014 and a heart attack in October 2014. Compl. 4-10, ECF No. 1; MDS 1-2, ECF No. 15. Jackson claims that the remaining individual defendants acted wantonly, maliciously, and willfully with deliberate indifference to his serious medical needs. Complaint 11, 12, ECF No.1. Specifically, Jackson alleges that Dr. Duckworth prescribed the medication Metroprolol, and later doubled the dosage even though it was not reducing his blood pressure, and even though it was later discovered that he was allergic to it. MDS 5, ECF No. 15. Jackson contends that all of the defendants continued him on such medication despite his ongoing complaints of adverse reactions. MDS 5, ECF No. 15. Jackson also asserts a claim against the USA under the FTCA alleging negligence on the part of the medical providers at FCI-Seagoville and FCI-Fort Worth.

## II.    INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Individual defendants Joseph Capps, M.D. ("Capps"), A. Baruti, M.D. ("Baruti"), Charles Eilert, M.D. ("Eilert"), Mohammad Naeem ("Naeem"), and A. Duckworth, M.D. ("Duckworth") move to dismiss Jackson's claims against them under Federal Rule of Civil Procedure 12(b)(6).

Capps Mot. Dismiss and Brief, ECF Nos. 43, 44; Baruti Mot. Dismiss with Brief, ECF No. 45; Eilert Corrected[3] Mot. Dismiss with Brief, ECF No. 48; Naeem Mot. Dismiss with Brief, ECF No. 47; Duckworth Mot. Dismiss with Brief, ECF No. 49. Jackson filed a combined response and Defendants replied. Resp. 1-12, ECF No. 52; Reply ECF No. 53; Collective Reply ECF No. 54.

For the following reasons, the Court grants the individual defendants motions to dismiss on the basis that Jackson has failed to state plausible claims for relief.[4]

## A. Applicable Law

### 1. Rule 12(b)(6) Standard

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is generally viewed with disfavor. *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir.1997). The court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (citing *True v. Robles,* 571 F.3d 412, 417 (5th Cir. 2009)). Rule 12 must be interpreted in conjunction with Rule 8(a), which sets forth the requirements for pleading a claim for relief in federal court and calls for "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A plaintiff must plead specific facts, not mere conclusory allegations, to avoid dismissal. *See Schultea v. Wood*, 47 F.3d 1427, 1431 (5th Cir. 1995)(en banc);

---

[3]Eilert initially filed a motion to dismiss but then filed a "corrected" motion to dismiss a few days later. ECF Nos. 46 and 48. The Court considers the later corrected motion as an amended motion that replaces the first motion.

[4]Defendants Baruti, Eilert, Naeem, and Duckworth also claim in their respective motions that each of them is entitled to qualified immunity. Mots. Dismiss § III (C), ECF Nos. 45, 47, 48, 49. Because the Court has determined it can grant the 12(b)(6) motions on the basis of Jackson's failure to state a claim upon which relief may be granted, the Court does not reach the qualified immunity arguments.

*see also Taylor v. Brooks A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss") (citation omitted). Rule of Civil Procedure 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As the Supreme Court explained in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" and his "factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (abrogating *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), to the extent the Court concluded therein that a plaintiff can survive a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief"). Then, in *Ashcroft v. Iqbal,* the Supreme Court clarified that review of a 12(b)(6) motion is guided by two principles: one, a court must apply the presumption of truthfulness only to factual matters, and not to legal conclusions; and two, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678-79. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court  to draw on its judicial experience and common sense." *Id.,* at 679. The Supreme Court noted that courts should not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). If the pleadings fail to meet the requirements of *Iqbal* and *Twombly,* no viable claim is stated and the pleadings are subject to dismissal.

2.      <u>Review of Medical Records Incorporated by Plaintiff</u>

Although all well-pleaded facts are viewed in the light most favorable to the plaintiff, *City*

*of Canton, Ark., v. Pilgrim's Pride Corp.*, 623 F.3d 148, 152-53 (5th Cir. 2010), "[w]here the allegations in the complaint are contradicted by facts established by documents attached as exhibits to the complaint, the court may properly disregard the allegations." *Martinez v. Reno*, No. 3:97-cv-813-P, 1997 WL 786250, at * 2 (N.D. Tex. Dec. 15, 1997) (citing *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).

As noted above, Jackson provided with his MDS an appendix of medical records related to his claims. App., ECF No. 16. Jackson relied upon these records in his MDS and thus incorporated them into his pleadings. Each defendant has referenced these medical records in their respective motions to dismiss and relied upon them in arguing that Jackson has failed to state claims upon which relief may be granted. "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his] claim." *Causey v. Sewell Cadillac–Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *see also Bosarge v. Mississippi Bureau of Narcotics*, 796 F.3d 435, 440-41 (5th Cir. 2015) (recognizing that "medical records attached to a complaint" . . . "generally trump contradictory allegations in the complaint") (citations omitted). Jackson provided the medical records and refers to them implicitly and explicitly throughout his MDS. MDS 1–22, ECF No. 15. Furthermore, Jackson's medical treatment, or lack thereof, is central to his deliberate indifference claims. Therefore, the medical records to which Jackson has referred to in both his complaint and MDS, and which he has provided as an appendix to his MDS, have been considered by the Court. *See Causey*, 394 F.3d at 288.

### 3. Constitutional Right to Medical Care

Jackson asserts his claims for violation of a constitutional right against the individual defendants under *Bivens* v. *Six Unknown Named Agents of the Federal Bureau of Narcotics*

(*"Bivens"*), 403 U.S. 388 (1971).[5] In order to assert a claim for damages for violation of federal constitutional rights under *Bivens*, a plaintiff must set forth facts in support of both of its elements: (1) the deprivation of a right secured by the Constitution or laws of the United States (2) by a person acting under color of law. *See West v. Atkins*, 487 U.S. 42, 48 (1988) (elements of § 1983 action); *Evans*, 168 F.3d at 863 n. 10. Defendants move for dismissal on the ground that Jackson has not sufficiently stated facts to support a claim that his Eighth Amendment constitutional right was violated.

The government's exercise of its power to hold prisoners brings with it a constitutional responsibility to tend to the essentials of their well-being, including by providing for their medical needs. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). Prison inmates derive their right to have these basic needs met from the Eighth Amendment's prohibition against cruel and unusual punishment. *Id*. As such, an inmate has a clearly established constitutional right not to be denied, by deliberate indifference, attention to his serious medical needs. *Id*. at 650.

Deliberate indifference to the serious medical needs of a prisoner constitutes an "unnecessary and wanton infliction of pain," in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A cause of action for deliberate indifference to an inmate's medical needs may be maintained if there is a delay in access to medical care that results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Such a finding of deliberate indifference, "must rest on facts clearly evincing 'wanton' actions on the parts of the defendants." *Johnson v. Treen*, 759 F.2d

---

[5]In the *Bivens* case, the Supreme Court recognized an individual's right to seek recovery for violation of constitutional rights by a person acting under color of federal law. 403 U.S. at 297. *Bivens* is the counterpart to 42 U.S.C. § 1983, and extends the protections afforded under § 1983 to parties injured by federal actors. *See Evans v. Ball*, 168 F.3d 856, 863 n. 10 (5th Cir. 1999) ("A *Bivens* action is analogous to an action under § 1983--the only difference being that § 1983 applies to constitutional violations by state, rather than federal officials"),*overruled on other grounds*, *Castellano v. Fragozo*, 352 F.3d 939, 948-49 & n. 36 (5th Cir. 2003).

1236, 1238 (5th Cir. 1985); *see also Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In *Farmer v. Brennan*, 511 U.S. 825, 835 (1994), the Supreme Court noted that deliberate indifference involves more than just mere negligence, and clarified that the applicable subjective deliberate-indifference standard is equated with the standard for criminal recklessness:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837.

In *Domino v. Texas Department of Criminal Justice*, the Fifth Circuit discussed the high standard involved in showing deliberate indifference in the medical context:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir.1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id*. Furthermore the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

239 F.3d 752, 756 (5th Cir.2001). "Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) (citations omitted).

Conversely, deliberate indifference "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001) (citations omitted). The "question whether ... additional diagnostic

techniques or forms of treatment is indicated is a classic example of a matter for medical judgment" and is not actionable. *Estelle*, 429 U.S. at 107; *see also Evans*, 168 F.3d at 863 n. 10 (as noted above analogizing a *Bivens* action an action under § 1983). "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) (citing *Mendoza*, 989 F.2d at 193-95).

**B.     Analysis**

Deliberate indifference is an extremely high standard to meet; unsuccessful medical treatment, acts of negligence, medical malpractice, or a prisoner's disagreement with his medical treatment will generally not suffice. *See generally Domino*, 239 F.3d at 756. Here, even accepting the facts pled by Jackson as true, his complaint and MDS with incorporated medical records, fail to state a plausible claim for relief against any defendant under that high standard.

1.     <u>Jackson's General Claims Against All Individual Defendants</u>

In his complaint, Jackson generally alleges that each of the remaining individual defendants violated his Eighth Amendment right to freedom from cruel and unusual punishment because each of them was advised of and aware of his high blood pressure, aware that his blood pressure was not responding to the efforts to treat it, but nonetheless failed to take sufficient actions to ameliorate these problems and prevent degeneration of his condition. Compl. 15–18, ECF No. 1. Jackson alleges that the failure in treatment caused him injury in the form of a stroke and a heart attack. *Id.* In the MDS, Jackson repeated numerous general allegations against the defendants collectively. He alleges that defendant Duckworth initially prescribed the drug Metropolol and then doubled the dose even though it was ineffective. MDS 5, ECF No. 15. He alleges the other defendants continued to prescribe this same medication despite his complaints of adverse reactions. *Id.*

Jackson's pleadings make clear that he disagrees with the decisions made by medical staff in attempting to treat his refractory high blood pressure. Jackson believes that defendants should have recognized his various complaints of headaches, dizziness, stiff neck, etc., as a medical allergy to the high blood pressure medicine they prescribed, and should have then changed the medication. Compl. 12, ECF No. 1. He complains that instead of changing the medication, at one point Dr. Duckworth, doubled the medication without personally examining him. *Id.* at 5, 15. Nonetheless, as he repeatedly admits and demonstrates in the complaint and MDS, the defendant medical staff provided ongoing and frequent medical care. Moreover, rather than showing that the defendants refused to treat him, ignored his complaints, or intentionally treated him incorrectly, the medical records included in the appendix to Jackson's MDS show the defendant medical providers attempted to address Jackson's medical conditions and complaints. New medications were ordered, old medications were increased, and multiple medical staff were actively engaged in attempting to treat Jackson. But while it is clear that Jackson perceived his alleged physical symptoms as an allergy to his medications, he presents no evidence that the BOP medical staff in general, or any defendant, found these symptoms to be signs of an allergy. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837. But that is his conclusion, and his disagreement with the medical care provided does not state a claim for deliberate indifference.

2.  Jackson's Specific Claims Against Each Defendant

a.  *Claim Against Dr. Duckworth*

Jackson's complaint states the following specific factual allegations with respect to Dr. Duckworth's care:

- He was first seen by Dr. Duckworth on January 15, 2013, at a chronic care

encounter where she noted that he had hypertension and no other medical or mental problems. Dr. Duckworth prescribed 50 mg daily of Metoprolol Tartrate for hypertension in addition to the 20 mg daily of Lisinopril he was already taking for hypertension. Compl. 4, ECF No.1.

- On or about February 5, 2013, he provided a blood sample as requested by Dr. Duckworth. Jackson claims that he continued to have hypertension but his lab work indicated no other abnormalities. *Id.*

- On or about April 9, 2013, he was seen by Dr. Duckworth for an evaluation regarding his hypertension. He claims his blood pressure and pulse were elevated at this appointment. He complains that Dr. Duckworth diagnosed him with Diabetes type II, but his A1C level was only 6.2, which he asserts is not generally considered diabetic. Dr. Duckworth prescribed 500 mg daily Metformin to control diabetes that Jackson believes was non-existent diabetes. *Id.* at 4–5.

- On May 31, 2013, he reported recurring headaches to Health Services that had begun after he started taking Metoprolol. Jackson claims that Dr. Duckworth co-signed a prescription for Hydrochlorothiazide 25 mg and he was continued on Metoprolol. *Id.* at 5.

- On June 4, 2013, he was seen at Health Services for a complaint of headaches. He claims his blood pressure was recorded as 170/107 and his pulse was 84. He claims that Dr. Duckworth ordered a "double dose" of Metoprolol by increasing his prescription to 50 mg twice daily. *Id.*

In the MDS, Jackson asserts the following more specific allegations against Dr. Duckworth:

- Dr. Duckworth prescribed Metoprolol to Jackson to control his high blood pressure, and later doubled the dosage. MDS 5, 12, ECF No.15.

- Dr. Duckworth continued Jackson on Metoprolol despite his complaints of adverse reactions to that medication and a lack of effectiveness. *Id*. at 5.

- At a clinical encounter on April 9, 2013, Dr. Duckworth recognized that Jackson had high blood pressure and took no action. He further alleges that he reported adverse side effects related to the blood pressure medication and Dr. Duckworth ignored this. *Id.* a 12.

- On June 4, 2013, Dr. Duckworth noted his blood pressure was high and doubled the

dose of very medication Jackson had reported was causing adverse side effects and increasing his blood pressure.[6]

- On August 9, 2013, he sought medical help because he was dizzy, light-headed, and had a severe headache. Jackson claims that he told Dr. Duckworth that he thought the prescribed medication was causing an adverse reaction but Dr. Duckworth did not provide any treatment but instead sent him back out into the prison population.

MDS 5, 12, ECF No. 15.

In reviewing Jackson's claims against Duckworth, the Court notes that the medical records relevant to particular dates of service do not support the allegations made by Jackson. First, as to the April 9, 2013 visit, the records do not support Jackson's claims that Dr. Duckworth took no action with respect to Jackson's blood pressure. Jackson cites to the second page of a four-page record of the medical encounter between Jackson and Dr. Duckworth on April 9, 2013. App. 8, ECF No. 16. On that page, there is no evidence of any action by Dr. Duckworth. *Id*. But on the third page of the record from that encounter, Duckworth renewed Jackson's prescriptions for aspirin, Lisinopril, and Metoprolol Tartrate to treat his hypertension. App. 9, ECF No. 16. o. 16 at 7; *see also* App. 5–6, ECF No. 16 (January 15, 2013 record with notations that aspirin, Lisinopril and Metoprolol Tartrate are for the treatment of hypertension)). The four-page record of the April 9, 2103 visit does not reflect that Jackson complained about alleged side effects.

Also, as to Jackson's assertion that in a clinic encounter on August 9, 2013, he told Dr. Duckworth that he thought he was having an allergic reaction, and that Duckworth did not provide treatment, but the medical record shows different facts. The record shows Jackson was seen by a

---

[6]The records included in the Appendix reflect that Jackson was actually seen by a registered nurse at the June 4, 2013 event. App. 11, ECF No.16. The nurse notified Dr. Duckworth that Jackson's blood pressure was 170/107 and Dr. Duckworth provided a verbal order for the Metoprolol dose to be increased from 50 mg daily to 50 mg twice daily. *Id.*

provider (not a defendant) other than Duckworth on August 9, 2013. App. 15, ECF No. 16. Jackson complained of dizziness and lightheadedness and a headache with a level 1 on a 1 to 10 pain scale. *Id.* The provider took his blood pressure and pulse, but did not report that Jackson claimed he was having an adverse reaction to medication. *Id.* The record does not reflect that Dr. Duckworth was present or that the provider contacted her, and there is no evidence that she co-signed this record. *Id.*

Moreover, Dr. Duckworth cannot be found to have been deliberately indifferent to Jackson's needs based on Jackson's belief that medical staff collectively at BOP failed to treat him properly. Rather, only Dr. Duckworth's conduct can be considered, as "each government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. The only non-conclusory allegations against Dr. Duckworth that are not directly contradicted by the medical records involve medical encounters on or about January 15, 2013 and April 9, 2013, and encounters on May 31, 2013 and June 4, 2013 with providers who contacted Dr. Duckworth for orders. But as Jackson's own allegations and documents reflect, Dr. Duckworth evaluated Jackson during the face-to-face encounters, and those encounters concluded with Dr. Duckworth renewing or making changes to Jackson's medications to treat his high blood pressure. App. 4–13, ECF No. 16. The records also show that Dr. Duckworth ordered necessary and appropriate laboratory tests. App. 6,9, ECF No. 16.

Jackson also complains about medical encounters with providers other than Dr. Duckworth where she was consulted by the provider. Specifically, on May 31, 2013 and June 4, 2013, he was seen by members of the BOP medical staff. App. 11–13, ECF No. 16. The registered nurse in those instances contacted Dr. Duckworth telephonically to obtain orders regarding Jackson's medications. The medical records show that Duckworth provided those orders. *Id.* Again, Jackson may disagree with how that was done and what Dr. Duckworth ordered, but his disagreement does not state a

claim of deliberate indifference.

In light of this review of the pleadings and medical records, Jackson has failed to state a plausible claim that Dr. Duckworth was deliberately indifferent to his serious medical needs.

### b. Claim Against Dr. Capps

Jackson's complaint states the following specific factual allegations with respect to Dr. Capps's care:

- On or about October 8, 2013, Plaintiff complained of stiffness in his neck he believed was cause by the Lisinopril prescription and his blood pressure was high and his "radial, femoral, dorsalis pedis and posterior tibialis pulse found to be diminished." Dr. Capps failed to address the diminished pulse issues. Compl. 6, ECF No. 1.

- Capps reduced the Lisinopril dosage to 10 mg daily and added Amlodipine 10 mg a day for hypertension. *Id.*

In the MDS, Jackson asserts the following specific allegations against Capps:

- Dr. Capps was aware of Jackson's "uncontrolled hypertension" from January 2013 through November 2013 and failed to take proper action. MDS 13, ECF No. 15.

- On May 13, 2013, he went to sick call experiencing headaches and side effects from a newly prescribed medicine but no action was taken. *Id.*

- On June 4, 2013, he again saw medical staff for high blood pressure when the medication Metoprolol was doubled, even though his blood pressure had increased on that medication [and] "Capps had reviewed these records and approved the inaction taken." *Id.* at 13–14.

- He had blood pressure readings of 191/123 and 170/107 while under Capps's care. Capps failed to take actions after seeing that there was a substantial risk to his health. Capps "cosigned" Jackson's records and took no action "when there was a clear error in medication performance and unsafe blood pressure levels." *Id.* at14.

- On August 8, 2013 sought medical treatment for complaints of dizziness, being

light-headed, and having a headache with an elevated blood pressure. No action was taken. Capps was responsible for his care. *Id.*

- On October 8, 2013, Jackson complained of what he believed to be symptoms of medication complications, including stiff neck, headache, dizziness, and problems with eyesight, and his blood pressure was 172/104, and he had a diminished pulse. Capps took "no meaningful action [and] never addressed the diminished pulse." *Id.* at 14-15.

- In November 2013, when Jackson was transferred to FCI-Fort Wortth, Capps failed to issue a care plan to control his hypertension. *Id.* at 15.

In support of his claims against Dr. Capps, Jackson refers to his recorded blood pressure of 191/123 on May 31, 2013, and his recorded blood pressure of 170/107 on June 4, 2013. Although Dr. Capps did not personally meet with Jackson on either of these days, Dr. Capps cosigned the administrative note on May 31, 2013, though not on June 4, 2013. App. 11–14, ECF No. 16. The administrative note on May 31, 2013 contained a verbal order by Dr. Duckworth to double Jackson's dosage of Metoprolol. App. 13; ECF No. 16. Jackson asserts that Dr. Capps reviewed the records and approved the actions taken by Dr. Duckworth despite it being "obvious" that Plaintiff was in danger and there was a problem with the medications. These allegations, however, fail to show Dr. Capps acted with deliberate indifference in the treatment of Jackson.

First, when Dr. Capps signed the medical records, Dr. Capps had no reason to believe that Dr. Duckworth was not working to treat Jackson's increased blood pressure and, in fact, changed a medication to do just that. Second, Dr. Capps's review of the medical records and co-signature simply emphasizes the fact that Dr. Capps did not ignore Jackson's complaints, but instead, evaluated his complaints and the treatment provided. As courts have reiterated, an incorrect diagnosis or different treatment than the one desired by the prisoner does not suffice as a valid claim for deliberate indifference. *See Stewart v. Murphy*, 174 F.3d 530, (5th Cir. 1999) ("Disagreement

with medical treatment does not state a claim for Eighth Amendment indifference to medical needs") (quoting *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)). Furthermore, attempts by prison medical personnel to treat a patient support a showing that the medical personnel did not act with deliberate indifference. *See Banuelos*, 41 F.3d at 235. While Jackson relies on the benefit of hindsight, he fails to state any facts that would support the notion that Dr. Capps should have known Metoprolol was causing adverse effects, nor does he state any facts to support a claim that Dr. Capps should have acted differently.

Jackson also refers to the date of October, 8, 2013, which is the only time Jackson was evaluated in person by Dr. Capps. App, 16–19, ECF No. 16. In the MDS, Jackson contends that he "again complained of what he believed to be medication complications (stiff neck, headache, dizziness)." MDS 14, ECF No. 15. Jackson mis-characterizes the medical record he attached to his MDS for that date of service. The record for October 8, 2013, states that Jackson "claims some stiffness in his neck with Lisinopril." App. 16, ECF No. 16. The record does not include any suggestion that Jackson then complained of headaches or dizziness. Furthermore, Jackson's complaint states "Plaintiff complained to FCI Seagoville Health Services of stiffness in his neck caused by the prescription Lisinopril." Compl. 6, ECF No.1. To avoid dismissal for failure to state a claim, Jackson must allege facts that support (1) Dr. Capps knew Jackson was suffering adverse reactions from his medications, (2) Dr. Capps knew he should make a change in the medications to avoid a serious medical harm, and (3) Dr. Capps was deliberately indifferent in failing to do so. Here, instead Jackson's fact allegations support that (1) Dr. Capps was told Lisinopril was causing problems and (2) Dr. Capps decreased the dosage of Lisinopril to attempt to address that problem. App. 16; ECF No. 16. This record does not state facts showing deliberate indifference.

Jackson further suggests Dr. Capps knew of his hypertension on October 8, 2013, but did not

address it. MDS 15, ECF No. 15. The records produced by Jackson, however, show Dr. Capps prescribed Amlodipine for Jackson's hypertension. App. 16–17, ECF No. 16. This record directly contradicts Jackson's assertion that Dr. Capps ignored his high blood pressure and did not actively work to provide treatment.

In addition to the above stated treatment provided by Dr. Capps, Jackson also suggests Dr. Capps should have addressed his "diminished pulse." MDS 15, ECF No. 15. As with other prior alleged facts, these are not sufficient to defeat dismissal. The facts alleged do not indicate Dr. Capps' knowledge of a diminished pulses constitutes knowledge of a serious medical harm. The facts also do not allege Dr. Capps ignored Jackson's conditions. On the contrary, the facts in Jackson's own documents establish Dr. Capps took steps to address Plaintiffs medical condition on October 8, 2013. App. 16–19, ECF No. 16.

Furthermore, nowhere in Jackson's complaint, MDS, or the medical records are there any facts that support a claim that any actions or omissions by Dr. Capps caused a hemorrhage, stroke, or heart attack. Dr. Capps saw Jackson on only one occasion and had very limited exposure to his medical care, certainly nothing beyond October, 2013. Thus, no facts have been alleged to create a causal nexus to the events several months later. Again, a valid claim for deliberate indifference requires a showing that the medical provider's deliberate indifference caused substantial harm. *See Smith,* 444 F. App'x. at 813, *citing Mendoza,* 989 F.2d at 195. Jackson has failed to state a plausible claim against Dr. Capps for deliberate indifference to his serious medical needs.

c.      *Claim Against Dr. Eilert*

Jackson's Complaint states the following specific factual allegations with respect to Dr. Eilert's care:

- Jackson alleges that Dr. Eilert saw him at a clinical encounter on November 4, 2013

and noted his blood pressure was not well controlled. Jackson claims that Dr. Eilert changed Norvasc to Cardizem to increase dosing for poorly controlled hypertension. Jackson claims that Dr. Eilert also prescribed Lopressor, a beta blocker. Compl. 6, ECF No. 1.

- Jackson also claims that he reported to Health Services on February 13, 2014, while experiencing elevated blood pressure, profuse sweating, weakness, vomiting, parasthesia, headaches, neck pain, and itching. Jackson claims that Dr. Eilert examined him and found "stroke-like symptoms" and requested that he be transferred to the local hospital. *Id*. at 7.

- Jackson alleges that Dr. Eilert evaluated him on February 21, 2014, for acute onset of nausea and dizziness. *See* Complaint at 8. Dr. Eilert noted that his blood pressure was poorly controlled, he had a recent pontine hemorrhage, and his non-fasting glucose was 125 CBC. Jackson claims he was instructed to return if symptoms worsened. *Id.* at 8.

In his MDS, Jackson asserts the following specific factual allegations against Dr. Eilert:

- Jackson alleges that Dr. Eilert saw him on November 4, 2013, and noted that he had poorly controlled high blood pressure and he should be seen in the future for this condition. MDS 8 and 16, ECF No. 15. Jackson alleges that Dr. Eilert understood that he had a serious blood pressure problem after reviewing his medical file and conducted no follow-up. *Id.* at 16. Jackson claims he reported to Health Services on November 14, 2013, with a painful headache, dizziness, and sweating and his blood pressure was recorded as 197/100, 181/95, and 192/99 and nothing was done for him. *Id.* Jackson claims he suffered a stroke on February 13, 2014 and was transferred to JPS Hospital. *Id.* at 16-17. Jackson claims that Dr. Eilert's deliberate indifference to his known hypertension was a direct and proximate cause of his stroke. *Id.* at 17.

In reviewing Jackson's claims against Dr. Eilert, the Court again looks to the medical records relevant to particular dates of service. Jackson attached the medical records from his November 4, 2013 encounter with Dr. Eilert. App. 21-27, ECF No. 16. This record indicates that Dr. Eilert took a history from Plaintiff and noted that he had a history of hypertension, hyperlipidemia, and diabetes mellitus type II. App. 21, ECF No. 16. The record shows Dr. Eilert changed Jackson's medication from Norvasc to Cardizem to be able to increase his dosing for poorly controlled hypertension. *Id.* Dr. Eilert also discontinued Lopressor because he was starting Jackson on Cardizem. *Id.* The record

also indicates Dr. Eilert ordered blood pressure checks to be taken twice weekly, and scheduled Plaintiff for a follow up appointment for his poorly controlled hypertension as well as a chronic care encounter for the same condition. App. 26, ECF No. 16. Dr. Eilert requested evaluations by the dietician to assist with weight loss as well as an evaluation from occupational therapy for diabetes and resulting foot care issues. *Id.*

Jackson also complains specifically of his encounter with Dr. Eilert on February 13, 2014. The medical record indicates that Dr. Eilert evaluated Plaintiff after he reported to Health Services with an acute onset of weakness and diaphoresis. App. 36, ECF No. 16. The record noted that Jackson had no chest pain or shortness of breath but did have nausea and vomiting without blood in the vomit. *Id.* Eilert ordered an EKG and an IV with oxygen monitoring. *Id.* Eilert referred Jackson to be taken to the emergency room at John Peter Smith (JPS) Hospital with a provisional diagnosis of acute EKG changes, diaphoresis, and stroke-like symptoms.[7] *Id.* at 37.

Next, Jackson complains of his February 21, 2014 clinic visit with Dr. Eilert. Jackson provided the medical record for his date of service. App. 53–56, ECF No. 16. Although Jackson reported to the clinic due to nausea and dizziness, Dr. Eilert assessed Jackson, took a history, performed a physical examination, and noted that Plaintiff was then alert and oriented and that his nausea had resolved. App. 53, ECF No.16. The record also indicates that during the triage assessment, labs were ordered for CBC, comprehensive metabolic profile, and Magnesium. App. 55, ECF No. 16.

In resolving whether Jackson has stated facts to support a claim against Dr. Eilert, the Court

---

[7] Jackson provided a BOP clinical encounter record dated February 18, 2014, upon his return from JPS Hospital, in which the nurse recorded that Jackson had been diagnosed with a hemorrhage brain pontine, but had suffered no deficits from the hemorrhage. App. 39, ECF No. 16.

considers only Eilert's alleged conduct. The only non-conclusory allegations against Dr. Eilert involve medical encounters on or about November 4, 2013, February 13, 2014, and February 21, 2014. But as Jackson's own allegations and documents reflect, as noted above, Dr. Eilert evaluated Jackson during the November 4, 2013 encounter, considered his complaints, and used his medical judgment to make changes to Jackson's medications. App. 21–27, ECF No. 16. Eilert also ordered laboratory tests. *Id.* at 23. Eilert entered consultation requests for Jackson to be seen by optometry, a dietician, and occupational therapy. *Id.* at 25–26. Similarly, Dr. Eilert fully evaluated Jackson during the February 13, 2014, visit, and ultimately had him transported to the emergency room at JPS Hospital for further evaluation and treatment. App. 36–39, ECF No. 16. As noted above, Eilert also performed a full evaluation of Jackson on February 21, 2014, with necessary laboratory tests ordered. App. 53–55, ECF No. 16.

Jackson writes that Dr. Eilert "took no action" on the fact that Jackson had blood pressure readings in the 190s on the November 14, 2013 encounter. MDS 16, ECF No. 15. The medical record submitted by Jackson for that date, however, indicates that he was seen by a nurse during that visit, not Dr. Eilert. App. 28, ECF No.16. The record also shows that Jackson was then sent to the pharmacy to pick up and take his blood pressure medications, with a direction to then eat lunch, and return to sick call for another blood pressure check, if his condition worsened. *Id.* Jackson was provided treatment by the provider he saw when he was at Health Services, and while Jackson may disagree with the treatment provided, such disagreement does not amount to a claim of deliberate indifference. Moreover, Dr. Eilert is not liable for the treatment provided by other medical professionals because there is no vicarious liability in a *Bivens* action. *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff mut plead that each Government-official defendant, through the official's own individual actions, has violated the

Constitution.")  Also, Jackson cannot support a claim that Dr. Eilert was deliberatively indifferent by not taking some additional, affirmative action on the November 14 medical visit, when Jackson himself did not return to the clinic for additional medical attention on that date.

In sum, Jackson has failed to state a plausible claim that Dr. Eilert was deliberately indifferent to his serious medical needs.

*d.*    *Claim Against Dr. Baruti*

Jackson's Complaint states the following specific factual allegations with respect to

Dr. Baruti's care:

> - On or about June 27, 2014, he reported intermittent headache occasional lower extremity numbness and twitching of the right hand, and difficulty with "words" at times and occasional slurred speech since hospitalization for a hemorrhage. He claims he had not been told to discontinue Metformin which had been causing him discomfort since it began. He alleges that he told Dr. Baruti that he had only been taking half the metformin dose at times. He claims that his blood work indicated that he did not have diabetes and he should not have been taking Metformin. He alleges that Dr. Baruti changed his prescription from Metformin to Glyburide. Compl. 9, ECF No. 1
> - Dr. Baruti failed to provide the recommended follow-up neurology consultation and heart monitor consultation. *Id.* at 16–17.

In his MDS, Jackson asserts the following additional specific factual allegations against Dr.
Baruti:

> - His blood pressure levels were extremely high and that Dr. Baruti "took no action" after reviewing Jackson's medical records and blood pressure readings on November 14, 2013. Jackson claims that he later suffered a stroke and then a heart attack with permanent brain/heart injury. Jackson claims that his blood pressure was 197/100, 181/95, and 192/99 on November 14, 2013, and that Dr. Baruti knew these blood pressure readings were extremely high, painful, and dangerous but took "no action" after reviewing the records and blood pressure readings. MDS 15-16; ECF No. 15.

As noted with other defendants, the Court must look to only the allegations against Dr.

Baruti. The Court notes first that as to the allegation in the MDS concerning the medical care provided to Jackson on November 14, 2013, as considered in regards to other defendants, Jackson does not allege that Dr. Baruti saw him on that day, and the records show he did not. App. 28, ECF No. 16. Rather, the notations indicate only that Dr. Baruti was asked to reviewed and cosign the record. *Id*. at 29. Jackson was provided treatment by the provider he saw when he was at Health Services on that date, and while Jackson may disagree with the treatment provided, such disagreement does not amount to a claim of deliberate indifference. Dr. Baruti is not liable for the treatment provided by other medical professionals. *See Iqbal*, 556 U.S. at 676.

The only other non-conclusory allegations against Dr. Baruti involve medical encounters on or about June 3, 2014 and June 27, 2014. But as Jackson's own allegations reflect, the June 3, 2014 encounter concluded with Dr. Baruti making changes to Jackson's medications. Compl. 9, ECF No. 1 (Baruti instructs to stop Metformin for diabetes, and start Atorvastalin for cholesterol). As to Jackson's claims for the later June 27 appointment, the medical record for that date shows that Dr. Baruti considered Jackson's complaints, and used her medical judgment to make changes to his medications. App. 61–66, ECF No. 16. Dr. Baruti ordered laboratory tests. *Id*. at 64–65. She entered a consultation request for Jackson to be seen by neurology. *Id*. at 65. Jackson appears to place blame on Dr. Baruti for the fact that he was not seen by the neurologist until on or about July 23, 2014. Compl. 10, ECF No. 1. But Jackson states no facts relating to whether Dr. Baruti controlled when inmates were allowed to be removed to meet outside consultants. And, a prison medical staff member's "failure to follow [another physician's] recommended treatment plan [does] not constitute deliberate indifference." *Clifford v. Doe*, 303 F. App'x 174, 175 (5th Cir. 2008) (citing *Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999)).

Jackson has not stated sufficient facts to make out a plausible claim that Dr. Baruti was

deliberately indifferent to his serious medical needs.

e.      *Claim Against Physician Assistant Naeem*

Jackson's Complaint states the following specific factual allegations with respect to Naeem's care:

> - On or about January 17, 2014, Jackson was seen at an encounter in Health Services where it was noted that his blood pressure was uncontrolled and not improved. Jackson claims that the lab work revealed an abnormal lipid profile and that PA Naeem increased his prescription for Lipitor from 20 mg to 40 mg daily and the prescription for Lisinopril from 10 mg to 20 mg daily. Jackson alleges that at the appointment, he continued to complain about adverse medication side effects, which he identifies as headaches, dizziness, and weakness. Compl. 7, ECF No. 1.

In his MDS, Jackson asserts the following additional specific factual allegation against Naeem:

> - Jackson alleges that PA Naeem saw him at an appointment on January 17, 2014, for uncontrolled hypertension and recorded his blood pressure as 152/79. Jackson claims that PA Naeem was aware of an "episode of extreme blood pressure" on November 14, 2013, and that he was also aware that Jackson's blood pressure had been uncontrolled since January of 2013. He alleges that PA Naeem displayed deliberate indifference by waiting two months to see Jackson after being made aware of Jackson's high blood pressure. Jackson also alleges that PA Naeem ignored his complaints of an "allergic reaction" to the prescribed medication. Jackson concludes that PA Naeem took no action and Jackson suffered a stroke on February 13, 2014. MDS 17, ECF No. 15.

As with the other individual defendants, to determine whether Jackson has sufficiently stated an Eighth Amendment claim against Physician's Assistant (PA) Mohammad Naeem, the Court examines only the conduct as allegedly taken by Naeem. The only non-conclusory allegation against PA Naeem involves a medical encounter on or about January 17, 2014. But as Jackson's own allegations and documents reflect, PA Naeem evaluated Jackson during that encounter, considered his complaints, and used his medical judgment to make changes to Jackson's medications in an attempt to better control his hypertension and hyperlipidemia. *See* App. 32–35, ECF No. 16. During

that clinic visit, PA Naeem also discussed diet, exercise, and weight loss with Jackson. App. 34; ECF No. 16.

Jackson also complains that PA Naeem signed off on a November 14, 2013 medical record note reflecting that Jackson had blood pressure readings in the 190s. MDS 17, ECF No. 16. Jackson concludes that "Naeem displayed deliberate indifference by waiting two months in order to see the Plaintiff." *Id.* The Court has considered this same record in reviewing Jackson's claims against other defendants. App. 28–30, ECF No. 16. As noted previously, the medical record submitted by Jackson reflects that he was seen by a non-defendant nurse during that visit, not PA Naeem or any other defendant. *Id.* And, as relayed before, the nurse then told Jackson to report to the pharmacy to pick up blood pressure medications and take them, and told Jackson to return to sick call if his condition worsened or as needed. App. 28; ECF No. 16. Jackson was provided treatment by the provider he saw when he was at Health Services, and while Jackson may disagree with the treatment provided by the nurse, such disagreement does not amount to a claim of deliberate indifference against Naeem. PA Naeem is not liable for the treatment provided by other medical professionals. *See Iqbal*, 556 U.S. at 676. Jackson cannot demonstrate that PA Naeem was deliberatively indifferent by signing off on the November 14, 2013 order, and not taking some additional, affirmative action, when Jackson himself did not return to the clinic on that instance for additional medical attention.

In sum, Jackson has not stated sufficient facts against Naeem to support a claim of deliberate indifference to his serious medical needs.

## C.      Conclusion

Jackson's recitation of the alleged failures in proper treatment for  his high blood pressure by the individually named defendants, states no plausible claims that they acted with deliberate indifference to Jackson's serious medical needs.  Jackson does not allege anything more than a

disagreement in the necessary treatment for his hypertension and other medical conditions. Jackson's claims for violation of his constitutional rights under *Bivens* against each of the remaining individual defendants must be dismissed for failure to state a claim upon which relief may be granted.

## III.    USA MOTION FOR SUMMARY JUDGMENT

Jackson has asserted a claim against the USA under the Federal Tort Claims Act (FTCA). Pending is the USA's motion for summary judgment. *See* USA Mot. for Summ. J, ECF No. 56; USA Brief, ECF No. 57; USA App., ECF Nos. 58–59, 59–1. Jackson filed a response to the motion for summary judgment and the USA filed a reply. *See* Resp. and Reply, ECF Nos. 65, 70. For the following reasons, the Court concludes that the USA is entitled to summary judgment on Jackson's FTCA claim.

### A.    Summary Judgment Evidence

The USA filed an appendix in support of its motion for summary judgment that includes 88 pages of records. ECF Nos. 58, 59–1. That appendix includes the August 10, 2018 Declaration/Certification of FMC-Fort Worth Medical Records Technician Barry Heller (ECF No. 58–1), with separately sealed 86 pages of medical records of the BOP related to Jackson (ECF No. 59–1, 1-86). Jackson provided copies of records to his response. MSJ Resp. 9–14, ECF No. 65. Four pages of these records are from 2016, beyond the scope of this case filed in September 2015. Thus those records, pages 9–12, ECF No. 65 will not be considered. Jackson also provided a two-page record from JPS Hospital dated February 17, 2014 (ECF No. 65, pages 12–14).

Jackson declared both his complaint and his more definite statement were each "true and correct" "under penalty of perjury." Compl. 20, ECF No. 1; MDS 18–19, ECF No. 15. Under controlling circuit authority, this Court must consider these pleadings as competent summary-

judgment evidence in resolving the summary judgment motion. *See Barnes v. Johnson*, 204 F. App'x 377, 378 (5th Cir. 2006) (citing *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (a plaintiff's verified complaint may serve as competent summary judgment evidence); *see also Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) (citing *Huckabay v. Moore*, 142 F.3d 233, 240 n. 6 (5th Cir. 1998); *see generally Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1989) (noting that the statutory exception in 28 U.S.C. § 1746 permits unsworn declarations to substitute for an affidavit if made "under penalty of perjury" and verified as "true and correct").

The USA has presented a lengthy history related to what the medical records provided in the USA Appendix (ECF No. 59-1) reveal—many of these records are copies of the same records provided by Jackson in the Appendix in support of his MDS (ECF No. 16)—regarding medical care provided to Jackson during the time period made the basis of his complaint. USA Brief 2–7, ECF No. 57. As explained in detail in the summary judgment analysis section below, because Jackson's medical claim for relief under the FTCA will be resolved on a legal ground, the Court does not include a restatement of a factual chronology.

### B. Summary Judgment Standard

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(a). "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001)(citation omitted). A fact is "material" if it "might affect the outcome of the suit under governing law."*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show

either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. FED. R. CIV. P. 56(c)(1). Although the Court is required to consider only the cited materials, it may consider other materials in the record. *See* FED. R. CIV. P. 56(c)(3). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. . . ." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n.7 (5th Cir. 1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (citing *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) (other citation omitted)). In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation omitted) (internal quotation marks omitted). "After the non-movant [here, Plaintiff] has been given the opportunity to raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### C. Summary Judgment Analysis

#### 1. Expert Testimony Required to Support Medical Negligence Claims

Jackson alleges negligence on the part of BOP medical staff in the treatment of his chronic hypertension as a claim under the FTCA. Compl. 13–14, ECF No. 1. He alleges that the medical care providers were unable to reduce his hypertension and did not recognize his allergic reactions to his blood pressure medication. *Id.* at 13-14. As noted above, Jackson alleges that his hypertension was

exacerbated by the ongoing prescription of Metoprolol and that he had an allergic reaction to that medication that led to a stroke in February 2014. MDS 2, ECF No. 15. He contends that the doctors responsible for prescribing his blood pressure medications failed to reduce his hypertension over a long period of time, which resulted in him suffering a heart attack in October 2014. *Id.* He alleges that the failure to provide proper treatment for his hypertension amounted to negligence that proximately caused him damages. Compl. 12–13, 14, 19, ECF No.1.

The FTCA authorizes civil actions for damages against the United States for personal injury caused by the negligence of government employees when private individuals would be liable under the substantive law of the state in which the negligent acts occurred. *See* 28 U.S.C.A. § 1346(b)(1) (West Supp. 2016); 28 U.S.C.A. § 2674 (West 2006); *see also Quijano v. United States*, 325 F.3d 654, 567 (5th Cir. 2003). Jackson complains of alleged medical negligence occurring at FCI-Seagoville and FCI-Fort Worth in Texas, so Texas law applies to Jackson's FTCA claims. *See Ayers v. United States*, 750 F.2d 449, 452 n.1 (5th Cir. 1985) ("Under the [FTCA], liability for medical malpractice is controlled by state law.").

In Texas, "health care liability claims are subject to strict pleading and proof requirements." *N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 561 (5th Cir. 2008) (citing Tex. Civ. Prac. & Rem. Code §§ 74.001–507). Particular to the medical negligence context, under Texas law the plaintiff bears the burden of proving four elements: (1) a duty by the physician or hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) injury; and (4) a causal connection between the breach of care and the injury. *See Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008) (citing *Quijano*, 325 F.3d at 564-567); *see also Bryan v. Sherick*, 279 S.W. 3d 731, 732-33 (Tex. App.--Amarillo 2007, no pet); and *Denton Reg. Med. Ctr. V. LaCroix*, 947 S.W. 2d 941, 950 (Tex. App.-Fort Worth 1997, no writ). As a threshold issue, a

plaintiff must establish the standard of care before the fact finder may consider whether the defendant breached the standard of care or if such a breach constituted negligence. *Hannah*, 523 F.3d at 601; *Denton Reg. Med. Ctr.*, 947 S.W.2d at 950. A Plaintiff must therefore prove how a reasonably careful and prudent physician would have acted under the same or similar circumstances. *See Hood v. Phillips*, 554 S.W. 2d 160, 165-66 (Tex. 1977). Texas law imposes a presumption that the health-care provider has discharged his duty of care. *Thomas v. Beckering*, 391 S.W. 2d 771, 775 (Tex. Civ. App.--Tyler 1965, writ ref'd n.r.e.); *Shevack v. United States*, 528 F. Supp. 427, 431 (N.D. Tex. 1981). A physician is not a guarantor of a cure, and negligence is not imputed from an unsatisfactory outcome. *See Hunter v. Robison*, 488 S.W. 2d 555, 560 (Tex. Civ. App.--Dallas 1978, writ ref'd n.r.e.); *Beckering*, 391 S.W. 2d at 775. Defeating the presumption of proper care requires affirmative proof of negligence and proximate cause. *Williford v. Banowsky*, 563 S.W. 2d 702, 705 (Tex. Civ. App.--Eastland 1978, writ ref'd n.r.e.).

Expert testimony is required when the alleged negligence is "of such a nature as not to be within the experience of the layman." *FFE Transp. Serv., Inc. V. Fulgham*, 154 S.W.3d 84, 90 (Tex. 2004) (quoting *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982)) (other citations omitted). Particular to the medical context, expert testimony is required to establish the applicable standard of care "unless the mode or form of treatment is a matter of common knowledge or is within the experience of the layman . . .." *Hannah*, 523 F.3d at 601 (quoting *Hood*, 554 S.W. 2d at 165-66). The Plaintiff must similarly offer expert testimony on the issue of causation. *See Jelinek v. Casas*, 328 S.W. 3d 526, 533 (Tex. 2010) ("[T]he plaintiff must establish two causal nexuses in order to be entitled to recovery: (a) a causal nexus between the defendant's conduct and the event sued upon; and (b) a causal nexus between the event sued upon and the plaintiff's injuries"); *see also Arlington Memorial Hosp. Found., Inc., v. Baird,* 991 S.W. 2d 918, 922 (Tex. App. Fort Worth 1999, pet.

denied) (citation omitted). A plaintiff must establish causation beyond the point of conjecture, and proof of mere possibilities does not support submission of the issue to a fact finder. *Jelinek* 328 S.W. 3d at 537; *Christus,* 227 S.W. 3d at 874. In this regard, "mere speculation or conjecture is not sufficient to establish [a] causal connection between a defendant's conduct and the plaintiff's injuries." *Martin v. Durden,* 965 S.W.2d 562, 567 (Tex. App.-Houston [14th Dist.] 1997 writ denied) (citation omitted). In sum, an expert must explain, to a reasonable degree of medical probability, how and why the alleged negligence caused the injury based on the facts presented. *Jelinek*, 328 S.W. 3d at 539-40.

2. <u>Failure to Provide Expert Testimony</u>

The USA moves for summary judgment on the basis that Jackson has not provided expert testimony to establish the particular standard of care and whether he sustained injury resulting from a breach of that standard. After rejecting his motion for appointment of an expert, and even though the Court provided Jackson a lengthy extension of time to locate an expert and have that person offer testimony/evidence on this behalf, Jackson has acknowledged that he "will not be able to secure an expert witness to testify on his behalf." Mot. Reopen 1, ECF No. 68. Thus, Jackson has not met the requirements of relevant Texas state law as he has not provided any expert testimony to support the required elements of a medical negligence claim.

Jackson cannot escape the burden to prove the medical care providers' duty to act according to an applicable standard of care for the treatment of hypertension; a breach of that standard of care; an injury; and a causal connection between the breach of care and the injury. *See generally Hannah*, 523 F.3d at 601; *Cruse*, 2015 WL 6134030, at *2. Jackson has not shown—and cannot show—that the medical standard of care and the issues of breach and causation regarding the treatment of the medical conditions detailed in his pleadings are matters of common knowledge or within the general

experience of a lay person, so as to excuse the requirement to provide evidence in the form of expert testimony. *See Yandal v. United States*, No.15-102-DLB-HAI, 2016 WL 4769735, at \*3 (E.D. Ky. Sep. 13, 2016) ("The layman exception does not apply in this case as Plaintiff has failed to provide any authority or argument for its application to the factual basis for his claim. Plaintiff's case is not one in which a foreign object was left in his body or where the wrong part of his body was treated. His claim is based upon the theory that he was prescribed medication, to which he was allergic, and the he was given the wrong treatment to treat that allergic reaction. Based on this record, the Court cannot conclude that a layperson would conclude that [doctor] Robinson should not have prescribed him the [particular medication] or even be competent to make that determination"); *see also Williams v. Nelson, Et Al.*, No.1:09-0697, 2012 WL 3744759 at \*10 n.8 (S.D. W. Va. June 6, 2012) (finding that the possible side-effects or allergic reactions to certain medications prescribed by BOP medical officials are not within the understanding of lay jurors by resort to common knowledge and experience).

Moreover, as the medical records before the Court reveal, Jackson was seen and treated by medical personnel on numerous occasions during the time period at issue in this suit. The records reflect that medical providers were responsive and tried a myriad of treatments to address Jackson's high blood pressure. The fact that those interventions were unsuccessful in controlling Plaintiff's hypertension is not evidence of negligence, as Texas law recognizes that a bad outcome is not, alone, evidence of negligence. *See Senior Care Centers, LLC v. Shelton*, 459 S.W.3d 753, 758–59 (Tex. App.—Dallas 2015, no pet.) (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.303(e)(2) (West 2011)). That Jackson believes BOP medical staff should have treated him differently is not evidence that the treatment he received fell below the appropriate standard of care. *See generally Kennedy v. United States*, No.00-51006, 2001 WL 822793, \*1 (5th Cir. 2001) (former inmate's conclusory assertions

of negligence in the medical treatment he received were insufficient to carry his summary-judgment burden); *Martinez v. Griffin*, 840 F.2d 314, 315 (5th Cir. 1988) (noting that it is not for federal courts to second-guess what is an "obviously careful diagnosis and adequate medical treatment"). At most, Jackson's record of medical treatment reflects that despite a number of interventions by medical staff at FCI-Seagoville and FCI-Fort Worth *and* outside medical personnel such as employees of JPS Hospital, his hypertension remained poorly controlled. That is not evidence sufficient to meet his burden of proof that the medical staff was negligent.

Jackson responds to his failure to provide expert testimony in support of his medical negligence claims by arguing that this Court should employ the doctrine of *res ipsa loquitor* to determine that an improper prescription of a particular blood pressure medication could only arise from a want of proper medical care. Resp. 4-5 ECF No. 67; Mot. Reopen 1, ECF No. 68. The Texas Supreme Court has generally explained the doctrine of *res ipsa loquitor* as follows: "*Res ipsa loquitur*, meaning 'the thing speaks for itself,' is used in certain limited types of cases when the circumstances surrounding the accident constitute sufficient evidence of the defendant's negligence to support such a finding." *Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex.1980) (internal citations omitted). The Texas high court also explained that "[h]istorically, *res ipsa loquitor* has been restrictively applied in medical malpractice cases." *Haddock*, 793 S.W.2d at 951. In medical malpractice cases, the doctrine applies only "when the nature of the alleged malpractice and injuries are plainly within the common knowledge of laymen, requiring no expert testimony." *Id*. Generally, the doctrine has been applied to the following three categories of cases: (1) negligence in the use of mechanical instruments; (2) operating on the wrong part of the body; or (3) leaving surgical instruments or sponges within the body." *Id*. Although the doctrine generally applies to these categories of cases, it does not automatically apply in every case. *Id*. For example, the doctrine does

not apply in a medical malpractice case alleging negligence in the use of a mechanical instrument "when the use of the mechanical instrument is not a matter within the common knowledge of laymen." *Id.*

The Court's research has found no cases extending the doctrine of *res ipsa loquitor* to a claim based upon medical negligence arising from a mis-diagnosed allergy to certain medication, prescription of the wrong medication, or other negligence arising from the prescription of medication. This is because such decisions inherently are not the kind of obvious injury where the doctrine has been found applicable. The Court rejects Jackson's argument to extend the doctrine of *res ipsa loquitor* to the facts underlying his medical negligence claims.

Accordingly, Jackson has not shown any entitlement, under any source of law, to be excused from the need to provide expert testimony. *See generally Prindle v. United States*, No. 4:10-cv-54-A, 2011 WL 1869795, at *1–2 (N.D. Tex. May 13, 2011) (holding that expert testimony is required to establish the standard of care with respect to a FTCA claim that medical personnel were negligent in failing to diagnose and treat carcinoma); *Woods v. United States*, No. 3:08-cv-1670-D, 2010 WL 809601, at *3 (N.D. Tex. Mar. 8, 2010) ("Since the conditions under which a doctor should prescribe Zocor [to a patient suffering with liver disease and diabetes] is neither a matter of common knowledge nor within the general experience of a layman, Plaintiff must produce expert testimony to establish the applicable standard of care and to show that the treatment he received breached that standard").

Because Jackson failed to designate an expert who would provide evidentiary support for his medical negligence claims, he is unable to establish the standard of care or breach of that standard regarding the treatment by the staff at FCI-Seagoville or FCI-Fort Worth for his particular hypertension condition. *See generally Hannah*, 523 F.3d at 602 (affirming district court's summary

judgment in favor of defendant where inmate plaintiff did not designate or hire an expert to testify regarding the applicable standard of care and how the care received breached that standard); *Hibbs v. United States*, No. 3:11-cv-2601-N-BH, 2013 WL 4434800, at *5 (N.D. Tex. Aug. 19, 2013) (granting summary judgment because inmate plaintiff did not designate an expert in medical malpractice claim); *Prindle*, 2011 WL 1869795, at *2 (granting summary judgment against inmate plaintiff where he failed to provide expert testimony as to diagnosing and treating renal cell carcinoma). Jackson cannot defeat summary judgment "with conclusory allegations, unsubstantiated assertions or 'only a scintilla of evidence.'" *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (citations omitted). As Jackson has failed to provide expert testimony regarding the elements of his tort claim, he cannot create a material fact issue on whether the FCI--Fort Worth or FCI-Seagoville medical staff breached a duty that proximately caused his medical related injuries. The USA is entitled to summary judgment on Plaintiff's claim for relief under the FTCA.

## IV.    ORDER

For the reasons discussed herein, it is therefore **ORDERED** that the individual defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) (ECF Nos. 43, 45 46, 47, 48, and 49) are **GRANTED**.

It is further **ORDERED** that Plaintiff's claims against A. Duckworth, M.D., Joseph Capps, M.D., A. Baruti, M.D., Charles Eilert, M.D., and Mohammad Naeem are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the USA's motion for summary judgment (ECF No. 56) is **GRANTED,** and Terry Lynn Jackson's claim against the United States of America is **DISMISSED WITH PREJUDICE.**

**SO ORDERED** on this **27th day** of **February, 2019**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**